1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

11

### EASTERN DISTRICT OF CALIFORNIA

12

13    DAVID URRABAZO, SR.,                    Case No.  1:14-cv-00309-SKO

14                Plaintiff,                  **ORDER REGARDING PLAINTIFF'S**
                                              **COMPLAINT**
15          v.

16    CAROLYN W. COLVIN,
      Acting Commissioner of Social Security,
17
                  Defendant.
18
      _____/
19

20                          **I.    INTRODUCTION**

21          Plaintiff David Urrabazo, Sr., ("Plaintiff") seeks judicial review of a final decision of the

22    Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for

23    disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles

24    II and XVI of the Social Security Act.  42 U.S.C. §§ 405(g), 1381-83.  The matter is currently

25    before the Court on the parties' briefs, which were submitted, without oral argument, to the

26    Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

27    _____

28    [1] The parties consented to the jurisdiction of a United States Magistrate Judge, and the matter was assigned for all
      purposes to Magistrate Judge Sheila K. Oberto.  (Docs 8, 9.)

## II.   FACTUAL BACKGROUND

Plaintiff was born on May 26, 1963 (AR 194), he attended special education classes while in school, completed the ninth grade, and has no vocational or technical certification or training. (AR 38.)  He last worked in construction between October 2007 and October 2008.  (AR 220.)

Plaintiff filed an application for DIB and SSI on January 26, 2011, alleging disability beginning on September 11, 2010, due to a right knee anterior cruciate ligament ("ACL") tear, degeneration and spurring in the right knee, pain and arthritis in his right knee, degeneration and pain in the lower back, left knee pain due to overcompensation, and a learning disability. (AR 194-208, 218.)

### A.   Relevant Evidence

Plaintiff underwent a right-knee arthroscopy and chondroplasty[2] in September 2009.  On July 27, 2010, Plaintiff underwent a lumbar spine x-ray which showed that the vertebral bodies and posterior elements were aligned satisfactorily, there were multi-level degenerative changes, and no acute fracture or dislocation.  (AR 414.)   In September 2010, Plaintiff underwent a Magnetic Resonance Imaging scan ("MRI") of his right knee which showed a complete tear of the ACL, but the rest of the tendons and ligaments remained intact.  (AR 416.)  There were prominent degenerative intra-mensical changes involving both the medial and lateral meniscus and retropatellar effusion. (AR 416.)   In October 2010, Plaintiff was seen at Madera Community Hospital reporting right-knee and lower-back pain, he was out of pain medication, and he was diagnosed with mild neural foraminal stenosis and a diffuse tear/injury to his right ACL. (AR 426.)  The treatment noted indicated Plaintiff refused a pain-clinic referral.  (AR 426.)

On October 15, 2010, Plaintiff underwent a right-knee x-ray that showed mild multi-compartmental degenerative joint disease and small suprapatellar effusion.  (AR 420.)   Plaintiff also underwent a computerized axial tomography ("CT") scan of his lumbar spine which revealed the following findings:

---

[2] Chondroplasty refers to repair of lacerated or displaced cartilage.  *Dorland's Illustrated Medical Dictionary* 359 (31st ed. 2007).

1.  The vertebral bodies and posterior elements demonstrate satisfactory alignment.

2.  There are mild to moderate multilevel degenerative changes including bridging osteophytes at L3-L4 and T12-L1.

3.  The neural foramina appear to be relatively patent at all levels.  However, at the presumed L5-S1 level, there is mild bilateral neural foraminal stenosis.  In addition, at L2-L3 and L4-L5, there is mild transverse compression of the thecal sac and slight encroachment upon the exiting nerve roots.

4.  There is no definite disc bulge, protrusion or extrusion identified on this exam.  However, a small disc bulge may go unrecognized on CT.

(Doc. 421-22.)   In October 2010, Plaintiff underwent another MRI of his right knee, and the radiologist provided the following impression:

1.  The findings are consistent with a diffuse tear and injury to the anterior cruciate ligament.  No normal ACL is identified.

2.  The rest of the tendons and ligaments are intact.

3.   There is extensive abnormal intrameniscal signal especially involving the anterior horn of the lateral meniscus which appears to represent a combination of grade II and grade III intrameniscal changes.  The rest of the menisci are intact with mild intrameniscal degenerative changes.

4.  Mild multicompartmental degenerative joint disease consistent with the patient's age.

5.  Small retropatellar effusion.

(AR 418.)

On October 27, 2010, Plaintiff was examined by treating physician Sharnjit Purewal, M.D., and he reported continued right-knee pain and that his knee gave out in the lateral direction. (AR 465.)  Plaintiff reported having seen an orthopedic surgeon who, based on a recent MRI, told him there was nothing more that could be done.  (AR 465.)  Plaintiff also complained about lower back pain and wanted to review the results of the CT scan.  (AR 465.)  Upon examination, Dr. Purewal noted no deformity or tenderness of the lumbar spine, a straight-leg raise was possible to 90 degrees bilaterally, the right knee had "a little bit of crepitance," there was minimal laxity in the anterior direction, and increased pain with flexion to about 110 to 115 degrees.  (AR 468-69.) Plaintiff's reflexes were noted to be normal, and he denied any difficulty with concentration.

3

1  (AR 467-68.)  Plaintiff's problems were noted as anxiety and depression which were unchanged,

2  and knee osteoarthritis for which medication was prescribed.  (AR 470.)  Plaintiff was to return in

3  two weeks to follow up with Dr. Purewal.  (AR 470.)

4         On October 28, 2010, Dr. Purewal completed a "physical capacities" form regarding

5  Plaintiff's limitations.  (AR 264-65.)  He checked a box that Plaintiff could only stand or walk for

6  "0-2" hours at one time due to knee and back pain that worsened upon standing or walking, and

7  Plaintiff was restricted from using his feet for repetitive movements due to his right-knee ACL

8  tear and derangement of the meniscus which caused pain and swelling.  (AR 264.)  Dr. Purewal

9  also checked boxes indicating Plaintiff could never lift *more* than 15 pounds, could occasionally

10  lift 15 pounds, and could frequently lift up to 10 pounds; Plaintiff was never to climb, stoop,

11  kneel, crouch, or crawl; Plaintiff could only occasionally reach below his knees, but could

12  frequently reach from his waist to his knees, and was unlimited from reaching above his waist.

13  (AR 265.)  Dr. Purewal added a note that Plaintiff had "[d]ecreased mental focus and slowed

14  reflexes."  (AR 265.)

15         In November 2010, Plaintiff again saw Dr. Purewal for a follow-up visit.  (AR 473-76.)

16  Plaintiff reported continued knee pain and that he had been taking Norco four times a day.

17  (AR 473.)  He was wearing a knee brace, but believed it might need to be more securely fitted.

18  (AR 473.)  Upon examination, Plaintiff's right knee had mild to moderate tenderness on the medial

19  knee joint, but no crepitance was noted.  (AR 474.)  Plaintiff indicated he had an appointment with

20  an orthopedic surgeon the following day, and he was instructed to follow up with Dr. Purewal in

21  one month.  (AR 475.)

22         In a March 2011 disability report completed by Plaintiff's wife, Plaintiff reported difficulty

23  concentrating and completing tasks.  (AR 233.)  In an undated disability report, Plaintiff indicated

24  he had trouble reading and writing and had participated in special education classes throughout his

25  schooling.  (AR 225.)

26         In April 2011, state agency physician Sharon Keith, M.D., reviewed Plaintiff's records and

27  opined that Plaintiff could lift and/or carry 20 pounds occasionally and up to 10 pounds

28  frequently; stand and/or walk approximately six hours in an eight-hour day; sit for a total of six

1  hours in an eight-hour day; could only occasionally climb ramps or stairs, balance, stoop, kneel,

2  crouch or crawl; and could never climb ladders, ropes, or scaffolding.  (AR 485-86.)

3       In May 2011, Plaintiff was again seen by Dr. Purewal.  (AR 547-50.)  Plaintiff reported he

4  continued to have right-knee pain which was better because he had been taking Naproxen twice a

5  day, but he also continued to take Vicodin.  (AR 547.)  Upon examination, Plaintiff's right knee

6  joint had minimal effusion, appeared less swollen than before, and the joint was stable with slight

7  lateral laxity.

8       On June 8, 2011, Plaintiff again followed up with Dr. Purewal and reported knee pain.

9  (AR 551.)  Although Plaintiff had a prior appointment with an orthopedic surgeon regarding his

10  right knee, the appointment was rescheduled due to the surgeon's unavailability.   (AR 551.)

11  Plaintiff complained of lower-back pain which became worse upon movement or bending.

12  (AR 551.)  On examination, Plaintiff's lumbar spine was without tenderness, deformity, or muscle

13  spasm; his range of motion was flexion to 75 degrees, extension to 30 degrees, and lateral flexion

14  to 30 degrees in both directions.  (AR 552.)  Dr. Purewal diagnosed Plaintiff with degenerative

15  joint disease of the lumbar spine, and the plan was to refill his medicines; Plaintiff was instructed

16  on lower-back exercises to perform, and he was to follow up with the orthopedic surgeon.

17  (AR 553.)

18       On July 2, 2011, Plaintiff underwent a comprehensive psychiatric evaluation with Mary

19  Lewis, Psy.D.  (AR 492-97.)  Plaintiff's chief complaint was knee pain that had been "going on for

20  two years."  (AR 492.)  He described the pain as throbbing and estimated it to be an eight on a

21  scale of one to 10, with 10 being the highest amount of pain.  (AR 492.)  He reported that he had

22  attended special education classes in school, and completed the ninth grade.  (AR 493.)  Upon

23  examination, Dr. Lewis noted that Plaintiff appeared to respond to questions in an open and honest

24  manner, and there appeared to be no exaggeration of symptoms or any inconsistencies throughout

25  the evaluation.  (AR 496.)  Plaintiff's limitations appeared to Dr. Lewis to stem primarily to his

26  reported medical concerns – i.e., his knee pain.  (AR 496.)  Plaintiff neither reported any

27  psychological distress as the basis for his application for social security benefits nor did he exhibit

28  symptoms consistent with a major mental disorder.  (AR 496.)  Dr. Lewis opined Plaintiff was

capable of managing his own funds, he had the ability to remember very short and simple instructions as well as detailed instructions; maintain concentration and attention; accept instructions from a supervisor and respond appropriately; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions at a consistent pace; interact with coworkers; and deal with various changes in the work setting. (AR 497.)   Plaintiff had only a minimal likelihood of emotionally deteriorating in the work environment, and his daily and social functioning abilities were not significantly impaired. (AR 497.)

In July 2011, Sheri L. Simon, PhD., reviewed Plaintiff's medical records and affirmed Dr. Lewis' opinion that Plaintiff had no severe mental impairment.  (AR 500.)

On July 13, 2011, Plaintiff followed up with Dr. Purewal and reported that his right knee was gradually worsening.  (AR 555.)  He had a knee brace and reported that it relieved the pain while it was on, but the pain was worse when he removed it.  (AR 555.)  Plaintiff was scheduled to see the orthopedic surgeon in the following week for his right knee and expected to undergo hyaluronic acid injections.   (AR 555.)   On examination, Plaintiff's right knee had moderate effusion, was positive for popping with pain on extension and flexion motions, but a drawer sign test[3] was negative.  (AR 557.)

On July 18, 2011, Plaintiff saw orthopedic surgeon Cyril Rebel, M.D., for his right knee pain.  Dr. Rebel noted he had treated Plaintiff for a long time, Plaintiff had undergone surgery on his right knee, and Plaintiff had gradually developed worsening degenerative joint disease of the right knee.  (AR 573.)  Upon examination, Plaintiff's knee showed well-healed scars from the 2009 surgery, mild swelling, no effusion, range of motion was -10 to 130 degrees, no varus or valgus instability, a negative anterior drawer test, a negative Lachman test, a negative pivot shift test, and a negative McMurray's test.  (AR 573.)  All range of motion caused discomfort and pain, there was some retropatellar crepitus on flexion and extension, and there was medial and lateral joint line tenderness on palpation.   (AR 573.)   Dr. Rebel reviewed x-rays which showed osteoarthritic changes of the right knee. (AR 573.) Dr. Rebel found significant chondromalacia of

---

[3] The drawer test is used to asses suspected rupture of the cruciate ligaments in the knee.

1   the patella, and he noted conservative treatment including pain medication and anti-inflammatories

2   continued to fail. (AR 573.) Dr. Rebel determined it was reasonable to proceed with

3   viscosupplementation injections but listed Plaintiff's prognosis as "guarded." (AR 574.) Dr.

4   Rebel did not believe a knee replacement was indicated because Plaintiff was too young and still

5   had "fairly reasonable" function with his knee. Moreover, Dr. Rebel believed that the knee

6   replacement would not meet Plaintiff's expectations, and he would have continued pain even after

7   a replacement. (AR 574.)

8        On August 10, 2011, Plaintiff followed up with Dr. Purewal, and reported continued right

9   knee pain. (AR 559-62.) Dr. Rebel had administered one injection a few days before Plaintiff's

10  examination with Dr. Purewal, and Plaintiff indicated the pain worsened after the injection.

11  Plaintiff was scheduled for two more injections. (AR 559.) On examination, Plaintiff's right knee

12  had mild effusion, the joint had some laxity when stressed, and no crepitance or tenderness was

13  noted. (AR 560.) The treatment plan included refilling Plaintiff's medication, requesting Dr.

14  Rebel send a report to Dr. Purewal, and scheduling Plaintiff to follow up with Dr. Purewal in one

15  month. (AR 562.)

16       On August 3, 2011, Dr. Rebel drafted a letter upon Plaintiff's request about Plaintiff's knee

17  condition:

18

19       . . . This patient has a degenerative joint disease of the right knee and he has
         significant degeneration of the patellofemoral joint. The patient has ongoing

20       chronic pain and chronic knee symptoms. The patient is undergoing treatment to
         help reduce the symptoms and problems.

21

22       In my opinion, it is very unlikely that this patient would be able to return to
         construction work or other heavy type of labor because of the condition of his knee.

23       The condition of his knee would preclude him from climbing, going up and down
         stairs or ladders, heavy pushing, pulling, lifting, crouching, kneeling, [and]

24       crawling.

25  (AR 571.)

26       On August 15, 2011, Plaintiff was seen by Dr. Rebel for his second right-knee injection,

27  and he was to follow up in one week for a third injection. (AR 570.) On August 22, 2011,

28  Plaintiff was seen by Dr. Rebel for a third right-knee Orthovisc injection. (AR 569.) Plaintiff was

1  to see Dr. Rebel in three months for a "routine follow-up." (AR 569.) Dr. Rebel stated that if the

2  injections were helpful, they could be done every 12 months for symptom control. (AR 569.)

3      On September 7, 2011, Plaintiff again was seen by Dr. Purewal and stated that his knee

4  pain was "a little bit" improved after the three shots administered by Dr. Rebel. (AR 563.)

5  However, when Plaintiff walked, the pain was about the same as prior to the injections. (AR 563.)

6  Plaintiff noted his lower back pain bothered him from "time to time." (AR 563.) The treatment

7  plan included continuing the pain and anti-depressant medication, recommending Plaintiff see a

8  counselor at his wife's work place or see a social worker, and Plaintiff was to follow up in one

9  month. (AR 566.)

10     In October 2011, Plaintiff was seen by a social worker, Kimberly Trejo, at Primary Care

11  Consultants, Inc. who completed an assessment form. (AR 579.) Plaintiff was referred for issues

12  related to chronic pain, depression, and anxiety. He reported that he had a bad knee, needed a

13  knee replacement, but that he was too young for the procedure. (AR 579.) Plaintiff noted

14  difficulty concentrating. The social worker administered a D-Arkansas Scale test, which she

15  described as a depression screening tool. (AR 579.) Plaintiff scored a twenty-one on the test,

16  which Ms. Trejo stated fell within the severe range for depressive symptoms; she noted Plaintiff

17  answered affirmatively "to the two questions about suicide." (AR 579-80.) Ms. Trejo reported

18  Plaintiff became emotional and began weeping when talking about the help his wife has given

19  him, and "he remained weepy for much of the appointment." (AR 580.) Ms. Trejo noted that

20  Plaintiff "appears to be lacking in critical emotional support and social networking[, and h]e is

21  moderate to high risk for a suicide attempt. Although he does not have access to firearms, he can

22  articulate other means via his 'thoughts' on a means to complete the act." (AR 580-81.)

23     In November 2011, Plaintiff underwent a lumbar spine x-ray which showed a moderate

24  amount of endplate spurring and mild concavity of vertebral body endplates. (AR 578.)

25     On January 10, 2012, state agency physician Suzanne Hanna, M.D., reviewed Plaintiff's

26  file and affirmed Dr. Keith's April 2011 opinion. (AR 619.) She reviewed the objective medical

27  evidence, the course of Plaintiff's treatment, and noted Dr. Purewal's October 2010 physical

28  capacities form was unsupported by any objective evidence. (AR 619.)

In March 2012, Plaintiff underwent an MRI of his right knee at Sierra Pacific Orthopedic & Spine Center ("Sierra Pacific"). (AR 620.) The radiologist provided the following impression:

> 1.   There is a tear involving the anterior root of the lateral meniscus with parameniscal cyst.

> 2.   Cartilage loss/edema is seen within the medial femoral condyle and lateral tibial plateau.

> 3.   Extensive cystic degeneration of the anterior cruciate ligament.

> 4.   Subchondral cyst formation in the lateral femoral condyle.

(AR 620.) Plaintiff was examined by Malcolm Ghazal, M.D., to whom he was referred by Dr. Purewal. On examination, Plaintiff was noted to walk with a mild right-sided limp, had minimal effusion or tenderness at the patellofemoral compartment, had no significant crepitus, and had a full range of motion. (AR 628.) Dr. Ghazal indicated a treatment plan that included a new MRI to rule out an ACL tear in the interim versus lateral meniscus tear, and that he would see Plaintiff again after the MRI was done to discuss a treatment plan. (AR 628.)

Also in March 2012, Plaintiff underwent an MRI of his lumbar spine. (AR 625-26.) The radiologist provided the following impression:

> 1.   Degenerative changes in the lumbar spine as detailed above, including mild-to-moderate right and mild left neural foraminal narrowing at the L4-L5 level secondary to a combination of a 6 mm broad-based central protrusion and mild hypertrophy of the facet joints.

> 2.   No significant spinal canal stenosis or neural foraminal narrowing identified at the rest of the imaged levels in the lumbar spine.

> 3.   Lobulated appearance of the left kidney, which may represent persistent left fetal lobulation of the left kidney.

(AR 626.)

On April 5, 2012, Plaintiff was again seen at Sierra Pacific for follow-up on his right knee pain. (AR 630-31.) The March 2012 MRI showed a lateral meniscal tear with a parameniscal cyst along the anterior root. (AR 630.) As Plaintiff was symptomatic with instability in his knee, the treatment plan was to request authorization for an ACL reconstruction.

On April 11, 2012, Plaintiff saw Dr. Purewal and reported worsening fatigue in the prior few weeks, a loss of motivation, increased sleepiness, and a loss of appetite.  (AR 715.)  To treat his depressive symptoms, Dr. Purewal increased the dosage of Plaintiff's Lexapro prescription. (AR 718.)

On April 25, 2012, Plaintiff saw Ms. Trejo and reported he was very "stressed."  Ms. Trejo reported that Plaintiff seemed to have trouble holding others accountable for services they are supposed to provide, and he lacks effective and assertive communication skills.  (AR 720.)  She found that he was encouraged to have his knee surgery in July.  (AR 720.)

In June 2012, state agency physician R. Mitgang, M.D., reviewed Plaintiff's medical records and the objective medical evidence obtained since Dr. Keith and Dr. Hanna had reviewed the record and indicated the limitation to light work opined by Drs. Keith and Hanna remained appropriate.  (AR 623.)

On July 2, 2012, Plaintiff underwent an ACL reconstruction on his right knee.  (AR 633.) Following surgery, Plaintiff was to complete a home exercise program and 18 sessions of physical therapy over 6 weeks.  (AR 633.)

Plaintiff followed up with Dr. Ghazal after his surgery; the treatment plan included range-of-motion strengthening and a follow-up in six weeks or sooner if there were difficulties. (AR 637.)

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 69-82; 83-120, 138-39.)  On October 30, 2012, the ALJ held a hearing.  (AR 33-68.)   Plaintiff testified, through the assistance of counsel, and a vocational expert also gave testimony.  (AR 33-68.)

**1.      Plaintiff's Hearing Testimony**

Plaintiff testified that he is married with three children, his wife is going to school full-time and working part-time, and he has a driver's license and is able to drive.  (AR 37.)  Plaintiff needs no help with his personal care, he does some household chores such as a "bit of dishes and a little

1   bit of laundry." (AR 38.) He is also able to microwave food, perform some shopping, and a "little

2   bit of yard work," such as cutting grass on a riding lawnmower. (AR 38.)

3       A typical day includes taking his children to the bus stop for school, "picking up" at the

4   house, doing a couple loads of laundry, and then relaxing by elevating his knee and taking

5   medication. He watches television and takes naps during the day. (AR 39.)

6       His medical condition includes pain in his knee following surgical repair of his right ACL.

7   Following the knee surgery, Plaintiff remained in pain. His knee remains "kind of loose," and he

8   experiences swelling. (AR 43.) Plaintiff underwent physical therapy, but it helped very little.

9   (AR 43.) He wears a knee brace all the time, and he still takes pain medications including Vicodin

10  and Norco. (AR 44.) Plaintiff also has pain in his left knee, which aches "like the right one

11  started to," and he was told that it was "just wear and tear." (AR 44.) Pain medication helps very

12  little, and he elevates his leg and applies ice four times per day for approximately 30 minutes.

13  (AR 44-45.)

14      Plaintiff also has a back condition that causes him pain, which increases when he walks.

15  He has not been able to find a comfortable position for his lower back, and he applies ice for pain

16  relief. (AR 45.) Plaintiff receives treatment for his lower back from Clinic Consultants. (AR 45.)

17      Plaintiff is able to lift and carry about 20 to 25 pounds (AR 47) but could not sustain this

18  amount of lifting for two to three hours per day (AR 51), sit for about 30 minutes, stand in one

19  place for approximately 35 to 40 minutes but must change position after approximately 15 minutes

20  (AR 52), and walk less than a block. (AR 47.) He must sit down to put on his shoes and socks,

21  and he cannot climb stairs. (AR 47.) Sitting, however, bothers his knee and his back. (AR 53.)

22  He switches between sitting, standing, and lying down during the day and is in each position for

23  approximately two hours. (AR 54.)

24      Plaintiff has pain in both his hands, but he has not had any treatment because he has no

25  medical insurance. He pays cash to his primary care physician, but he is unable to afford

26  treatment for his hands. (AR 59.) He has trouble using his hands, such as grabbing things like

27  dishes, and he can use his hands for only thirty minutes before needing a 15- to 20-minute rest.

28  (AR 60-61.) He was told that he has carpal tunnel syndrome. (AR 59.)

1    Plaintiff experiences anxiety and stress due to the fact that his father "just went to the

2    nursing home," and his brother needs a kidney.  (AR 47-48.)  He has difficulty getting along with

3    people "sometimes," and he is still taking Citalopram and Alprazolam which help calm him down

4    "a little bit."  His primary care physician referred him to counseling with a social worker, and he

5    was seeing her twice a month, but she requires cash payment.  (AR 49.)  If he has cash, he will see

6    her once a month.   (AR 49.)   Plaintiff indicated his mental health problems affect his

7    concentration, and Plaintiff is unable to concentrate for a two-hour shift.  (AR 49.)  Although his

8    concentration was worsening, Plaintiff indicated he had been smoking marijuana in the prior year

9    for his pain.  (AR 49.)  He has a medical marijuana card and he smoked once a day in December

10   2011.  (AR 50.)

11    Plaintiff was examined by a social security doctor, and Plaintiff was depressed at the time

12   he was examined.  Since that examination, Plaintiff believes his focus and concentration is worse

13   since he has been "off" the marijuana.  (AR 51.)

14    Plaintiff's education is limited to the ninth grade, and he attended special education classes

15   while in school.  He has difficulty with reading and writing.  (AR 57.)  For example, he is unable

16   to read a newspaper and understand the sentences.  (AR 57.)  He is unable to write out a grocery

17   list and cannot read a grocery list written by someone else.  (AR 58.)  Nevertheless, Plaintiff

18   admitted that he reads very simple children's books to his six-year old child and that this was

19   representative of his reading and writing abilities.  (AR 58.)

20        **2.      Vocational Expert's Hearing Testimony**

21    The vocational expert ("VE") characterized Plaintiff's past work as a "conveyor feeder-off

22   bearer" which requires medium exertion,[4] a Specific Vocational Preparation ("SVP") rating[5] of 2,

23   and is categorized as unskilled.  (AR 62.)  Plaintiff's insulation job was characterized as an

24   ─────────────────────
     [4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects
25   weighing up to 25 pounds.  If someone can do medium work, [the Commissioner determines] that he or she can also
     do sedentary and light work."  20 C.F.R. §§ 404.1567(c), 416.967(c).

26
     [5] The Dictionary of Occupational Titles ("DOT") lists Specific Vocational Preparation ratings for each described
27   occupation.  SVP is defined "as the amount of lapsed time required by a typical worker to learn the techniques,
     acquire the information, and develop the facility needed for average performance in a specific job-worker situation."
28   DOT, App. C, 1991 WL 688702.

"insulation power unit tender," and it is classified by the DOT as light work, semiskilled, with an SVP rating of 4. (AR 62.)  Plaintiff's past work as a light fixture servicer is medium and unskilled. (AR 62.)    Finally, his work lubing and changing oil was characterized by the VE as a "maintenance mechanic," and it is considered medium, skilled work with an SVP rating of 7. (AR 62.)  The VE explained that Plaintiff's skills acquired at his past work were transferrable only to heavy and medium exertional-level work.  (AR 63.)

The ALJ posed hypotheticals for the VE to consider.  The ALJ asked the VE to consider a hypothetical person of the same age and education as Plaintiff and with the same work history who is limited to lifting and carrying 20 pounds occasionally, and 10 pounds frequently; sitting, standing, and/or walking six to eight hours with only occasional stooping, crouching, crawling, climbing, kneeling, balancing, and no climbing ladders, ropes, or scaffolds or working at heights or on uneven terrain.   (AR 63.)   The ALJ asked whether such an individual could perform Plaintiff's past work, and the VE testified the only job that could be performed as defined by the DOT was an insulation power unit tender.  (AR 63.)

In a second hypothetical, the ALJ asked the VE to consider the same hypothetical person but with the additional limitation to only simple, routine tasks.  (AR 64.)  The VE testified that such a person could not perform any of Plaintiff's past work, but there would be other light work that such a person could perform such as cashier II, DOT 211.462-010; fast foods worker, DOT 311.472-010; housekeeping, cleaner, DOT 323.687-014.

The ALJ posed a third hypothetical asking the VE to consider all the limitations of the first hypothetical, but to assume the person could only sit six to eight hours; stand and/or walk for two hours; only occasionally stoop, crouch, crawl, climb, kneel, balance; and could climb no ladders, ropes, or scaffolds or operate at heights or on uneven terrain.  (AR 64.)  The VE testified that such a person could not perform any of Plaintiff's past relevant work, but could perform other light work such as cashier II, ticket seller, sewing machine operator, and toe-closing machine tender. (AR 65.)   The ALJ asked the VE to consider whether there were sedentary jobs such a person could perform, and the VE testified that the entire world of sedentary work would be open to such a person.  (AR 65.)

1     The ALJ asked a fourth hypothetical assuming all the physical limitations of the previous

2 individual, but with the added limitation that the person would need to take two to four 30-minute

3 breaks per day.  (AR 66.)  The VE testified that a person with these limitations could not perform

4 Plaintiff's past relevant work or any other work in the national economy.  (AR 66.)

5     **3.     ALJ's Decision**

6     On November 9, 2012, the ALJ issued a decision finding Plaintiff not disabled.  (AR 17-

7 27.)  The ALJ determined Plaintiff has the Residual Functional Capacity ("RFC")[6] to lift and carry

8 20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk for six hours in an eight-

9 hour day; could occasionally stoop, crouch, crawl, climb, kneel, and balance; but was precluded

10 from climbing ladders, ropes, or scaffolds, working at unprotected heights or on uneven terrain.

11 Plaintiff was also limited to simple, routine tasks.  (AR 21.)

12     The ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since

13 September 11, 2010, the date of alleged onset; (2) has the following severe impairments or

14 combination of impairments:  right knee degenerative joint disease, chondromalacia patella status

15 post arthroscopic surgery; ACL reconstruction and lateral meniscectomy, obesity, depression,

16 anxiety, and a learning disorder; (3) does not have an impairment or combination of impairments

17 that meets or medically equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P,

18 Appendix 1; (4) is unable to perform his past relevant work; but (5) he is able to perform

19 alternative work that exists in significant numbers in the national economy.  (AR 17-27.)

20     Plaintiff sought review of the ALJ's decision before the Appeals Council.  (AR 12-13.)  On

21 December 31, 2013, the Appeals Council denied review.  (AR 1-6.)  Therefore, the ALJ's decision

22 became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

23

24

25

---

26 [6] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1    **C.    Plaintiff's Contention on Appeal**

2        Plaintiff contends the ALJ erred by failing to adequately consider Plaintiff's illiteracy and

3    age, improperly weighing the medical evidence, and improperly assessing Plaintiff's credibility.

4    (Doc. 14.)

5                              **III.    SCOPE OF REVIEW**

6        The ALJ's decision denying benefits "will be disturbed only if that decision is not

7    supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

8    601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

9    judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

10   Instead, the Court must determine whether the Commissioner applied the proper legal standards

11   and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

12   *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

13       "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v.*

14   *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

15   relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

16   *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

17   305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

18   the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

19   may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v.*

20   *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

21                              **IV.    APPLICABLE LAW**

22       An individual is considered disabled for purposes of disability benefits if he is unable to

23   engage in any substantial, gainful activity by reason of any medically determinable physical or

24   mental impairment that can be expected to result in death or that has lasted, or can be expected to

25   last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

26   1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or

27   impairments must result from anatomical, physiological, or psychological abnormalities that are

28   demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

1   such severity that the claimant is not only unable to do his previous work, but cannot, considering

2   his age, education, and work experience, engage in any other kind of substantial, gainful work that

3   exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

4          The regulations provide that the ALJ must undertake a specific five-step sequential

5   analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine

6   whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R.

7   §§ 404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the

8   claimant has a severe impairment or a combination of impairments significantly limiting her from

9   performing basic work activities.   20 C.F.R. §§ 404.1520(c), 416.920(c).  If so, in the Third Step,

10  the ALJ must determine whether the claimant has a severe impairment or combination of

11  impairments that meets or equals the requirements of the Listing of Impairments ("Listing"),

12  20 C.F.R. 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If not, in the Fourth

13  Step, the ALJ must determine whether the claimant has sufficient residual functional capacity

14  despite the impairment or various limitations to perform her past work.  20 C.F.R. §§ 404.1520(f),

15  416.920(f).  If not, in Step Five, the burden shifts to the Commissioner to show that the claimant

16  can perform other work that exists in significant numbers in the national economy.   20 C.F.R.

17  §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the

18  sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99

19  (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

20                                      **V.   DISCUSSION**

21  **A.      The ALJ's Consideration of the Medical Evidence**

22          Plaintiff argues the ALJ improperly assessed Plaintiff's RFC by failing to adequately

23  consider the opinions of Drs. Purewal and Rebel.

24          The medical opinions of three types of medical sources are recognized in Social Security

25  cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not

26  treat the claimant (examining physicians); and (3) those who neither examine nor treat the

27  claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

28  Generally, a treating physician's opinion should be accorded more weight than opinions of doctors

who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id.* Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Id.* If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

### 1.   The Failure to Consider Dr. Purewal's October 2010 Opinion Was Prejudicial Error

Plaintiff contends that the ALJ erred by failing to expressly consider Dr. Purewal's October 2011 opinion regarding Plaintiff's physical limitations.[7] Plaintiff argues Dr. Purewal is his long-time treating physician, and thus his opinion was entitled to deference. Plaintiff asserts that Dr. Purewal's October opinion discussed Plaintiff's postural and exertional limitations, but these limitations were neither adopted nor discussed by the ALJ.

Defendant first notes that Plaintiff argues Dr. Purewal rendered his "check-box" opinion in 2011, but the form is dated October 28, 2010, one year earlier. (AR 265.) Defendant also maintains that Plaintiff misconstrues Dr. Purewal's opinion to be that Plaintiff could stand and walk only 0 to 2 hours total in a day, but the opinion stated that he could only stand and walk 0 to 2 hours at one time. (AR 264.) Notwithstanding these errors in Plaintiff's brief, the ALJ considered the totality of the treatment records and the opinions of three state agency physicians, who reviewed Plaintiff's medical records. When Dr. Hanna reviewed the medical evidence in January 2012, she specifically noted that Dr. Purewal's 2010 opinion was unsupported by his

---

[7] As the Commissioner notes, Plaintiff states Dr. Purewal's form report was signed in 2011, but the report states that it was signed in October 2010. (AR 265.)

1    treatment notes.  Defendant notes that Dr. Purewal examined Plaintiff the day before he completed

2    the function report on October 28, 2010, and the examination notes do not show any support for

3    the restrictive limitations Dr. Purewal imposed in the form the following day.  For example, in his

4    examination notes, Dr. Purewal described Plaintiff as well developed, well nourished, and in no

5    acute distress.  He indicated Plaintiff had no tenderness in the lower back, a bit of crepitance in the

6    right knee, but a full range of motion in all joints.  Defendant also notes that while Dr. Purewal's

7    clinical findings indicate Plaintiff had normal reflexes (AR 469), Dr. Purewal's report the next day

8    indicated Plaintiff had decreased reflexes due to the side effects of medication (AR 265).

9    Defendant argues it is unclear from his treatment notes how Dr. Purewal arrived at his opinion in

10   his October 28, 2010, functional report that Plaintiff was so significantly limited.

11          Dr. Purewal completed a form in October 2010 that set out Plaintiff's physical capacities in

12   a check-box form ("2010 form report").  (AR 264-65.)  The 2010 form report indicated Plaintiff

13   could stand or walk for up to only two hours at one time, and Plaintiff's knee could only tolerate

14   light use such as driving a car with an automatic transmission.  (AR 264.)  Dr. Purewal checked

15   boxes indicating Plaintiff should never lift 20 pounds or heavier, may only occasionally lift up to

16   15 pounds, and may frequently lift up to 10 pounds.  (AR 265.)  Dr. Purewal checked boxes

17   indicating Plaintiff should *never* climb, stoop, kneel, crouch, or crawl and only occasionally

18   balance.    (AR 265.)    Moreover, he indicated Plaintiff should reach below his knees only

19   occasionally, could frequently reach from his waist to his knees, and could constantly reach above

20   his waist.  (AR 265.)  Finally, Dr. Purewal noted that Plaintiff had "[d]ecreased mental focus and

21   slowed reflexes."  (AR 265.)

22          The ALJ did not expressly discuss the 2010 form report from Dr. Purewal in the decision.

23   Because the report was relevant to Plaintiff's functional limitations, it was error for the ALJ not to

24   expressly consider it.  *Marsh v. Colvin*, __ F.3d. __, __, No. 12-17014 slip. op. at *6 (9th Cir. June

25   18, 2015) (error for the ALJ to fail to give reasons for rejecting treating physician's opinion).  The

26   Court is required, however, to consider whether the failure to discuss Dr. Purewal's 2010 form

27   report was harmful error.  *Id.*

28

1    Application of the harmless error analysis is "fact-intensive – 'no presumptions operate'

2  and '[the court] must analyze harmlessness in light of the circumstances of the case.'"  *Id.* at * 5

3  (quoting *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012)).  ALJ errors in social security

4  cases are harmless "if they are 'inconsequential to the ultimate nondisability determination' and

5  that 'a reviewing court cannot consider [an] error harmless unless it can confidently conclude that

6  no reasonable ALJ, when fully crediting the testimony, could have reached a different disability

7  determination.'"  *Id.* at * 7 (quoting *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56

8  (9th Cir. 2006).  In *McLeod*, the Ninth Circuit provided the following guidance for application of

9  the prejudicial error analysis:

10   [W]here the circumstances of the case show a substantial likelihood of prejudice,
     remand is appropriate so that the agency can decide whether re-consideration is
11   necessary.  By contrast, where harmlessness is clear and not a borderline question,
     remand for reconsideration is appropriate.
12

13  *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011).

14    Here, the ALJ's discussion of the medical evidence included a thorough summary of Dr.

15  Purewal's objective and subjective treatment notes throughout Dr. Purewal's treatment of Plaintiff

16  during the relevant time period.  Although the 2010 form report was completed during the course

17  of Plaintiff's treatment for his knee and back conditions, Plaintiff subsequently had surgery on his

18  knee in July 2012.  The ALJ noted that following surgery on his knee, Plaintiff's prognosis was

19  fair to good, which indicated improvement.  The 2010 form report by Dr. Purewal is arguably stale

20  in view of additional medical treatment and surgery Plaintiff underwent after the report was

21  rendered.

22    Additionally, Dr. Purewal's 2010 form report opinion  fails to include a discussion of any

23  objective medical evidence.  A medical report should include a diagnosis and objective or clinical

24  support for the stated limitations.  20 C.F.R. §§ 404.1513(b), 416.913(b).  Dr. Purewal's 2010 form

25  report contains no discussion of the clinical or objective support for the limitations opined; it notes

26  only that Plaintiff had a right knee ACL tear and derangement of the meniscus.  (AR 264.)  As

27  Plaintiff's treating physician who had access to Plaintiff's treating records, Dr. Purewal could have

28

1  provided some discussion as to the basis of his opinions, but the check-box form contains no

2  explanation why Plaintiff's limitations were as significant as opined.

3      The opinions of the reviewing physicians, which the ALJ credited, provided a short

4  narrative of the basis for their opinions.  For example, Dr. Hanna's January 2012 opinion discussed

5  important objective findings and Plaintiff's conservative treatment regime which had not been

6  changed over the course of his treatment.  (AR 619.)  In contrast, Dr. Purewal's 2010 form report

7  contains no discussion of his own treatment records to substantiate his opinion.    The ALJ was not

8  obligated to accept the opinion and incorporate it into his RFC because it was "brief, conclusory,

9  and inadequately supported by clinical findings."  *Thomas*, 278 F.3d at 957 ("The ALJ need not

10 accept the opinion of any physician, even a treating physician, if that opinion is brief, conclusory,

11 and inadequately supported by clinical findings.").

12     Dr. Purewal's notation that Plaintiff suffered decreased mental focus and slowed reflexes

13 was inconsistent with Dr. Purewal's October 27, 2010, examination notes – which were taken the

14 day before the 2010 form report was completed.  (AR 467.)  The October 27, 2010, examination

15 notes reveal that Plaintiff denied any difficulty with concentration (AR 467), and on examination

16 Plaintiff's reflexes were noted to be normal (AR 469).    Given these inconsistencies with the

17 treatment notes and the conclusory nature of the 2010 form report, the ALJ was not obligated to

18 credit the 2010 form report completed by Dr. Purewal.  *Batson*, 359 F.3d 1190, 1195 (9th Cir.

19 2004) (ALJ properly rejected treating physician's conclusory check-list report); *Crane v. Shalala*,

20 76 F.3d 251, 253 (9th Cir. 1996) (ALJ may reject check-off reports that do not explain basis for

21 conclusions); *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (ALJ may discredit treating

22 physician's opinion that is conclusory, brief, and unsupported by the record as a whole).  Finally,

23 at the November 2012 hearing, Plaintiff conceded that he could lift between 20 to 25 pounds,

24 which contradicts Dr. Purewal's 2010 form report regarding Plaintiff's ability to lift and carry

25 weight.  (*Compare* AR 46 *with* AR 265.)

26     Nonetheless, if Dr. Purewal's opinion were credited by the ALJ, and Plaintiff was restricted

27 from *ever* lifting more than 15 pounds, or performing any reaching below his knees, and was *never*

28 permitted to climb, stoop, kneel, crouch, or crawl, and Plaintiff had decreased mental focus and

1   slowed reflexes, there is insufficient evidence that Plaintiff would be able to work.  While the VE

2   testified that Plaintiff could perform the "world of sedentary work" (AR 64), which would

3   encompasses the lifting limitation opined by Dr. Purewal, the VE did not give an opinion about

4   the work an individual could perform with the postural limitations imposed by Dr. Purewal – *e.g.*,

5   a complete preclusion from stooping.  As noted by Social Security Ruling 96-9p, 1996 WL

6   374185, *1 (July 2, 1996), an inability to stoop would significantly erode the unskilled sedentary

7   occupational base and a finding that the individual is disabled would usually apply.  Thus,

8   although there are persuasive reasons to discredit Dr. Purewal's 2010 form report and find the

9   ALJ's silent rejection of it harmless, the Ninth Circuit instructed in *Marsh* that a district court

10  could not supply those reasons in the first instance.  *Marsh*, No. 12-17014, slip op. at *8 ("Here,

11  the district court gave persuasive reasons to determine harmlessness.  But the decision on

12  disability rests with the ALJ and the Commissioner of Social Security Administration in the first

13  instance, not with a district court.").  Because crediting Dr. Purewal's opinion would potentially

14  alter the disability determination, the undersigned cannot confidently conclude that the failure to

15  consider Dr. Purewal's 2010 form report was harmless error.  The matter must be remanded to the

16  ALJ for further consideration pursuant to *Marsh*.

17          **2.      Silent Rejection of A Portion of Dr. Rebel's Opinion Was Not Prejudicial
                      Error**
18

19          Plaintiff argues that Dr. Rebel opined Plaintiff would be precluded from climbing, going

20  up stairs, ladders, heavy pushing, pulling, lifting, crouching, kneeling, and crawling.  The ALJ

21  credited Dr. Rebel's opinion that Plaintiff was precluded from heavy pushing, pulling, or lifting,

22  but failed to address the postural limitations opined.  Because these postural limitations were not

23  adopted by the ALJ, they were silently rejected without any stated basis.  (AR 24.)  Even

24  assuming these postural limitations were not properly discounted by the ALJ, Plaintiff has failed

25  to establish how this error was prejudicial.  Two jobs identified by the VE as work that Plaintiff

26  could perform require none of these postural abilities:  the DOT states that for the fast food worker

27  job and the cashier II job, there are no climbing, balancing, crouching, kneeling, or crawling

28  activities.  DICOT 311.472-010 (West 1991); DICOT 211.462-010 (West 1991).   Further, as to

1    "heavy" pushing and pulling, because the RFC was limited to only occasionally lifting or carrying

2    20 pounds, this limitation by Dr. Rebel was incorporated into the RFC.  The ALJ's failure to state

3    specific reasons for rejecting the postural limitations by Dr. Rebel was not harmful error.

4    Nonetheless, because the ALJ's decision will be remanded for further consideration of Dr.

5    Purewal's October 2010 form report which also contained postural limitations, the ALJ may give

6    renewed consideration to the postural limitations opined by Dr. Rebel.

7    **B.      The ALJ's Assessment of Plaintiff's Credibility**

8           Plaintiff argues the ALJ disregarded his lay statements about his symptoms because his

9    musculoskeletal impairments had been generally corrected with surgery, he had been able to work

10    for a long period of time notwithstanding his learning disabilities, and Plaintiff's anxiety and

11    depression were situational and medication helped.  Plaintiff argues these reasons for rejecting his

12    credibility are not supported by the record.

13           Plaintiff argues there is no evidence to support the ALJ's finding that his musculoskeletal

14    problems have been resolved by surgery.  Plaintiff asserts that since his ACL surgery, his pain has

15    remained the same, he continues to use a brace on that leg, and he still takes pain medication for

16    his knee.   Additionally, just because Plaintiff had a successful surgery does not mean he is

17    symptom free.  Plaintiff has a lower-back condition that causes pain, and he has had no surgery on

18    his back, thus that pain could not have been resolved with surgery.  As it pertains to Plaintiff's

19    depression and anxiety, the fact that medication "helps" or that his depression was termed by a

20    social worker to be "situational" does not bear any relation to Plaintiff's credibility.  Finally, that

21    Plaintiff was not prevented from working due to a learning disability prior to his disability has no

22    rational connection to Plaintiff's credibility.

23           Defendant contends the ALJ noted the objective evidence did not support Plaintiff's

24    symptom testimony, which is supported by the record.  On many examinations, Plaintiff had no

25    right-knee swelling or lower back tenderness, he demonstrated normal muscle strength and tone,

26    had a good range of motion, and walked normally.  He also responded to medication and injection

27    therapy to his knee.  (AR 477, 569.)  Moreover, the ALJ found Plaintiff's admitted daily activities

28    undermined his allegations of disabling pain.  Plaintiff testified that he needs no assistance with

his personal care, was able to perform simple household chores, yard work, sometimes he shopped, drove a car, attended church, and took his children to school sometimes on foot and sometimes by car.  Regarding Plaintiff's mental impairments, the ALJ noted Plaintiff complained of depression and stress at many of his doctor visits, but he was also on medication that helped with his symptoms, his treatment plan never changed, and according to a treating social worker Plaintiff saw for counseling, his depression was situational.

Although the ALJ cannot rely solely on inconsistencies between a plaintiff's claims of pain and subjective limitation and the medical evidence, it is a factor that the ALJ may consider in addition to others.  *See e.g., Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); *Morgan v. Comm'r Soc. Sec. Admin*, 169 F.3d 595, 599 (9th Cir. 1999) (ALJ may properly consider conflict in plaintiff's testimony of subjective complaints and objective medical evidence in the record).   The ALJ discussed at length the objective medical evidence relating to Plaintiff's knee and back condition.  An October CT of Plaintiff's lumbar spine confirmed mild to moderate degenerative changes, mild bilateral neural foraminal stenosis, and mild transverse compression of the thecal sac and slight encroachment upon the existing nerve roots with no definite disc bulge.  Plaintiff's back pain fluctuated on examination, but in March 2012, he stated his lower back pain was gradually improving.   None of the reviewing physicians considering this evidence found it to support the degree of functional limitations Plaintiff claimed.  (AR 484-91, 619.)  For example, in January 2012, Dr. Hanna noted that Plaintiff's treatment was conservative with oral pain medications, muscle relaxants, and back exercises, and there was no specialty care referral.  (AR 619.)  As to Plaintiff's knee, he underwent a second knee surgery in 2012 and the prognosis was fair to good, and by July 2012, the ALJ noted the surgical site was healing nicely.  (AR 23.)  Plaintiff indicated at the hearing he had not started physical therapy yet following his surgery, and he was still being treated by Dr. Ghazal for follow-up.  (AR 43.)  Plaintiff stated that in the past, physical therapy had not helped much at all.  (AR 43.)  The ALJ was entitled to consider the objective medical evidence showing that the source of Plaintiff's pain had been addressed by his recent surgery, and that it was better than

1    Plaintiff alleged, despite Plaintiff's testimony he still took pain medication.  *Batson*, 359 F.3d at

2    1198 (court must uphold an ALJ's rational interpretation of the evidence).

3        The ALJ also considered, as did the reviewing physicians, the degree of impairment to

4    Plaintiff's activities of daily living.  (AR 20, 491.)  The ALJ noted that Plaintiff indicated he

5    needed no assistance with his personal care, he could prepare simple meals, do laundry, wash

6    dishes, ride the lawn mower, and shop and drive.   Plaintiff's daily activities are a factor the ALJ

7    was entitled to consider in reaching his credibility determination.  *Fair v. Bowen*, 885 F.2d 597,

8    604 (9th Cir. 1989) (ALJ may properly rely on daily activities inconsistent with a claim of

9    disabling pain).

10       The ALJ was also entitled to consider that Plaintiff's pain medication was helping to

11   relieve his knee pain.  *See Morgan*, 169 F.3d at 599 (ALJ's adverse credibility determination

12   properly accounted for physician's report of improvement with medication).   This basis, in

13   conjunction with Plaintiff's recent knee surgery, was a basis to reject Plaintiff's limitation based on

14   knee pain.  Similarly, the ALJ was entitled to consider that Plaintiff's depressive symptoms were

15   helped by medication, which is relevant to assessing the extent of Plaintiff's symptom testimony

16   regarding his mental condition.

17       These reasons, taken together, are sufficiently clear and convincing to uphold the ALJ's

18   credibility determination.  To the extent the ALJ reconsiders Dr. Purewal's 2010 form report,

19   however, the credibility analysis may be given renewed consideration on remand.

20   **C.      No Prejudicial Error at the Fifth Step of the Sequential Evaluation**

21       Plaintiff argues that even if the ALJ properly considered the evidence to reach the RFC, the

22   ALJ erred at the Fifth Step by improperly considering Plaintiff's age and education level in

23   applying the Medical Vocational Guidelines (the "Grids").  Plaintiff's argument is twofold:  first,

24   the ALJ improperly assessed Plaintiff's literacy in finding Plaintiff able to communicate in

25   English; second, the ALJ failed to take into account Plaintiff's borderline age and apply the next

26   age category under the Grids.  Had the ALJ properly found Plaintiff illiterate *and* applied the next

27

28

1  age category ("closely approaching advanced age" rather than a "younger individual"), Grid Rule

2  202.09 would dictate a finding of disabled.[8]

3      The Commissioner contends the ALJ's determination that Plaintiff has a limited education

4  and is able to communicate in English is supported by substantial evidence.  Plaintiff has a ninth

5  grade education, which supports the finding that his education is "limited."  Plaintiff also reported

6  that he attended special education classes in school.  Although both Plaintiff and his wife describe

7  him as having problems with reading and writing, Plaintiff also reported that he could speak,

8  understand, read, and write English in one of his disability reports.  (AR 217.)  While Plaintiff

9  testified that he could not read or write a grocery list, he was able to read simple books to his six-

10 year old child.  (AR 38, 57.)  Psychological testing showed that Plaintiff's fund of knowledge was

11 consistent with his education level and his numerical reasoning was good based on his ability to

12 perform simple mathematics.  (AR 494-96.)  Thus, the ALJ's finding that Plaintiff had a limited

13 education but was nonetheless able to communicate in English was "based on a reasonable

14 evaluation of the evidence."  (Doc. 17, 9:15-10:23.)

15     With regard to Plaintiff's age, the Commissioner argues the ALJ applied the correct Grid

16 Rule and properly relied on VE testimony to find Plaintiff "not disabled" at the Fifth Step.  The

17 ALJ noted that Plaintiff was 47 years old on the date he alleged he became disabled, which was

18 September 11, 2010, and was 49 years old on the date of the ALJ's decision.  At both of these

19 ages, Plaintiff was considered a "younger individual" for purposes of the Grid Rules.  Plaintiff was

20 not in a "borderline" age situation either at the time of his alleged onset date or at the time of the

21 ALJ's decision because at neither time was he a few days or a few months from the next age

22 category (closely approaching advanced age – *i.e.*, 50 or older).  Finally, the ALJ relied not just on

23 the Grid Rules, but also relied upon VE testimony indicating that a person of Plaintiff's age and

24 remaining abilities could perform alternative work in the national economy.

25

26 _____

27 [8] To be prejudicial, both findings must be improper.  Even if Plaintiff had been considered in the next age category (closely approaching advanced age), but was properly found to be literate, the Grids would still dictate a finding of not disabled.  20 C.F.R. Pt 404, Subpt. P, App. 2, Grid Rule 202.10.  Similarly, if Plaintiff's age was properly considered (younger individual) but Plaintiff was improperly found to be literate, the Grids would still dictate a finding of "not disabled."  20 C.F.R. Pt 404, Subpt. P, App. 2, Grid Rule 202.16.

28

The ALJ determined Plaintiff had a limited education, but is able to communicate in English; the VE testified that Plaintiff's skills transferred only to heavy and medium jobs (AR 63), but Plaintiff's RFC limited him to light work only and thus Plaintiff had no job skills transferrable to light work (*see* AR 25-26); and the ALJ found Plaintiff was born on May 26, 1963, and was considered a "younger individual" under the Grids (AR 25).

The potentially applicable Grid Rules are as follows for individuals limited to light work:

| Grid Rule | Age Category | Education and Literacy | Skill Set | Disability Finding |
|---|---|---|---|---|
| 202.09 | Closely approaching advanced age | Illiterate or unable to communicate in English | Unskilled or none | Disabled |
| 202.10 | Closely approaching advanced age | Limited or less – at least literate and able to communicate in English | Unskilled or none | Not Disabled |
| 202.16 | Younger Individual | Illiterate or unable to communicate in English | Unskilled or none | Not Disabled |
| 202.17 | Younger Individual | Limited or less – at least literate and able to communicate in English | Unskilled or none | Not Disabled |
| 202.18 | Younger Individual | Limited or less | Skilled or semi-skilled—skills not transferrable | Not Disabled |

### 1.    The ALJ Properly Considered Plaintiff's Age

Social Security regulations distinguish among claimants in three different age categories: younger individuals (claimants under age 50), individuals closely approaching advanced age (claimants age 50 to 54), and individuals of advanced age (claimants 55 or older).  20 C.F.R. §§ 404.1563(c)-(e), 416.963(c)-(e).  Where a claimant is within a few months of reaching an older age category, the claimant is considered to be in a "borderline" age situation.  *Id.* at §§ 404.1563(b), 416.963(b).  In a "borderline" age situation – where a shift in the ultimate result could occur with the passage of a few days or a few months – the ALJ has discretion, but is not required, to apply the older age category.  *Id.*  The governing regulations explain how the agency will assess borderline age situations:

1

2

3

4

> We will use each of the age categories that applies to you during the period for which we must determine if you are disabled.  We will not apply age categories mechanically in a borderline situation.  If you are within a few days to a few months of reaching an older age category, and using an older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

5

20 C.F.R. §§ 404.1563(b), 416.963(b).

6

7

8

9

Nevertheless, even where a claimant falls squarely within a "borderline situation" for purposes of applying an age category, "there is no requirement that the ALJ explain in her written decision why she did not use an older age category."  *Lockwood v. Commissioner of Soc. Sec. Admin.*, 616 F.3d 1068, 1070 (9th Cir. 2010).

10

11

12

13

14

15

16

17

18

The claimant in *Lockwood* was one month and three days from turning age 55 and becoming an individual of advanced age under the regulations.  *Id.* at 1069-70.  The ALJ did not, however, apply the older "advanced age" category to Lockwood and instead treated Lockwood as a person closely approaching advanced age.  *Id.* at 1070.  Moreover, the ALJ did not explain in her decision why the advanced age category was not applied.  The district court affirmed the ALJ's decision, and on appeal, the Ninth Circuit held the ALJ did not err by failing to address in the written decision why the higher age category was not applied.  Instead, the court found the borderline consideration required by the regulation was satisfied:

19

20

21

22

23

24

25

26

> Here, the ALJ satisfied the requirement that she consider whether to use the older age category.  The ALJ mentioned in her decision Lockwood's date of birth and found that Lockwood was 54 years old and, thus, a person closely approaching advanced age on the date of the ALJ's decision.  Clearly the ALJ was aware that Lockwood was just shy of her 55th birthday, at which point she would become a person of advanced age.  The ALJ also cited to 20 C.F.R. § 404.1563, which prohibited her from applying age categories mechanically in a borderline situation.  Thus, the ALJ's decision shows that the ALJ knew she had discretion to use the older age category after evaluating the overall impact of all the factors of Lockwood's case.  20 C.F.R. § 404.1563(b).  Finally, we are satisfied the ALJ did not apply the age categories mechanically because the ALJ evaluated the overall impact of all the factors of Lockwood's case when the ALJ relied on the testimony of a vocational expert before she found Lockwood was not disabled.  *Id.*

27

28

1   Plaintiff does not present a borderline age situation.  In *Russell v. Bowen*, 856 F.2d 81, 84

2  (9th Cir. 1988), the Ninth Circuit held that the claimant was not in a borderline situation because

3  he was 59 years and 5 months old at the time of the ALJ decision and "was in fact closer to age 59

4  than to age 60."  The court explained that "[l]ines must be drawn at some point, otherwise there

5  would be no efficient way to utilize the Grid system."  *Id.*  Here, Plaintiff was 49 years, 5 months,

6  and 14 days old when the ALJ's decision was issued on November 9, 2012.  Like *Russell*, Plaintiff

7  was closer to age 49 than to age 50 at the time of the ALJ's decision.  Although Plaintiff complains

8  that the borderline age situation was not addressed by the ALJ or the Appeals Council, there was

9  no borderline situation for the ALJ to address and neither the ALJ nor the Appeals Council was

10  required to consider the older age category.  Moreover, even if Plaintiff had been in a borderline

11  situation at the time of the ALJ's decision, there is no evidence that Plaintiff's age was not properly

12  considered by the ALJ under *Lockwood*.  Plaintiff's correct birthdate was set forth in the ALJ's

13  decision, and the ALJ properly noted the governing regulations, 20 C.F.R. §§ 404.1563, 416.963.

14  Thus, even if Plaintiff had been in a borderline age situation, the decision reflects that the ALJ did

15  not apply the age categories mechanically, and Plaintiff's age was properly considered.  *Lockwood*,

16  616 F.3d at 1070.

17            **2.        Substantial Evidence Supports that Plaintiff is Literate**

18            Regarding Plaintiff's literacy, because Plaintiff was not entitled to be classified as a person

19  "closely approaching advanced age," Plaintiff has not established how any error in the ALJ's

20  consideration of Plaintiff's literacy was harmful.  Indeed, Plaintiff concedes any error with regard

21  to Plaintiff's literacy is harmless *unless* Plaintiff was considered a person closely approaching

22  advanced age.  (Doc. 14, 16:20-17:1.)

23            Moreover, even if the ALJ's finding regarding Plaintiff's literacy was essential to the non-

24  disability finding, there was substantial evidence in the record to support a finding that Plaintiff

25  was literate.  "Illiteracy" is defined as the "inability to read or write."  20 C.F.R. §§

26  404.1564(b)(1), 416.964(b)(1).  A claimant who is able to read or write a simple message in

27  English is not considered illiterate.  *Id.*  Generally, an illiterate person has had little or no formal

28  schooling.  *Id.*  In *Silveira v. Apfel*, the Ninth Circuit considered whether an ALJ's failure to make

an express literacy finding was prejudicial.  204 F.3d 1257, 1261-62 (9th Cir. 2000).  The court

concluded there was insufficient evidence in the record to determine on appeal whether the

claimant was literate in English, thus the failure to make an express literacy finding was harmful

error:

> Silveira and his son reported that Silveira reads regularly.  Silveira did not state
> whether he reads in English or in Spanish; his son reported that he reads Spanish
> language books and newspapers.  The forms in the record signed by Silveira were
> either filled out by others on his behalf, or appear to have been filled out by others;
> none of the forms filled out in English was clearly filled out by Silveira without
> assistance.  The Commissioner notes that Silveira has a driver's license and that he
> shops, pays bills, and handles his bank account without assistance.   These
> transactions, however, can be conducted orally or, particularly in Southern
> California, in Spanish.  The Commissioner also notes that Silveira responded to all
> English language notices issued by the Administration, but Silveira apparently had
> ample assistance dealing with the paperwork related to his claim.

*Id.* at 1262 n.5.

None of the evidence before the court in *Silveira* constituted substantial evidence that the claimant

was able to read and write in English.  The facts in this case are distinguishable from *Silveira.*

Here, although Plaintiff and his wife stated that he could not read or write in English, there

was substantial evidence indicating that Plaintiff had a basic ability to read and write in English.

Although he was in special education classes, Plaintiff was able to complete the ninth grade. (AR

56.)  Plaintiff testified he was unable to read and understand a newspaper or write a grocery list

without assistance (AR 57), but he admitted he was able to read simple children's books to his six-

year old child, and indicated that such reading was reflective of his basic skill level (AR 58).

Given this testimony, there was substantial evidence to support a finding Plaintiff was able to read

and write at a very basic, but sufficient level.  The VE was present for Plaintiff's testimony

regarding his ability to read and write and that he completed the ninth grade while taking special

education classes, and the VE provided job testimony based on Plaintiff's educational level.  The

VE testified Plaintiff could perform work as a cashier II, fast food worker, and as a housekeeping

cleaner.  The DOT lists a job's general educational development ("GED") level which includes the

reading and writing skills required to perform a job.  *See* DOT, Appendix C-Components of the

1   Definition Trailer, 1991 WL 688702 (1991).   There are five defined GED levels for language

2   development under the DOT from level one (the least required reading and writing skills) to level

3   five (the most required reading and writing skills).   One of the jobs identified by the VE, that of

4   housekeeping cleaner, requires the lowest level of reading and writing.

5          In sum, Plaintiff has not established how the ALJ's failure to make an express literacy

6   finding was prejudicial.   Moreover, there is substantial evidence to support a finding that Plaintiff

7   is able to read and write at a very basic level.

8   **D.       Remand is Warranted**

9          Because the ALJ failed to give consideration to Dr. Purewal's October 2010 form report,

10  the matter must be remanded so that the issue can be properly considered by the ALJ.   As a

11  general rule, remand – rather than reversal for an award of benefits – is warranted where

12  additional administrative proceedings could remedy the defects in the Commissioner's decision.

13  *See Harmon v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000).   In this case, remand is appropriate for

14  renewed consideration of Dr. Purewal's October 2010 form report.   (AR 264-65.)   The ALJ is

15  instructed to take whatever further action is deemed appropriate and consistent with this decision.

16                                    **VI.   CONCLUSION**

17         After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the

18  record, the Court finds that the ALJ's decision is not supported by substantial evidence and is

19  therefore REVERSED and REMANDED.   The Clerk of this Court is DIRECTED to enter

20  judgment in favor of Plaintiff and against Defendant Carolyn W. Colvin, Acting Commissioner of

21  Social Security.

22

23  IT IS SO ORDERED.

24     Dated:   __July 16, 2015__                            _____**/s/ Sheila K. Oberto**
                                                        UNITED STATES MAGISTRATE JUDGE

25

26

27

28